

# ALACHUA COUNTY SHERIFF'S OFFICE
## ALACHUA COUNTY, FLORIDA
# NON-ENFORCEABLE RETURN OF SERVICE



**Document Number:** ASO20CIV006467NON          **Agency Number:**

**Court:** CIRCUIT

**County:** ALACHUA

**Case Number:** 2020CA001792

**Attorney/Agent:**
BOGIN MUNNS & MUNNS PA

628 S 14TH ST
LEESBURG, FL 34748


**Plaintiff:**  DAVID FLORES

**Defendant:**  ANTIBOTIC ADJUVANT INC A FLORIDA CORP DOING BUSINESS AS SMART STEWARD INC AND
GAETANO P LATORRE


**Type of Process:** SUMMONS, COMPLAINT, EXHIBITS A-C

### CORPORATE - SERVICE ON A STATUTORY OFFICER

PERSON TO BE SERVED:  ANTIBIOTIC ADJUVANT INC
4416 NW 60TH TERR , GAINESVILLE, FL

Received the above named writ on 7/8/2020  at 4:48 PM, and served the same on 7/13/2020 at 7:25 AM, in Alachua
County, Florida, by delivering a true copy of this writ together with a copy of the initial pleadings, if any, with the date and
hour of service endorsed thereon by me, to : GAETANO LATORRE, DIRECTOR, of the within corporation on a statutory
officer as defined in Section 48.081(1)(a), or in the absence of any higher ranking officer as defined in Section
48.081(1)(b), Florida Statutes.


SADIE DARNELL
ALACHUA

By: _____
K. HOLT, 197

Service Fee:     $40.00
Receipt No:     64393-20-D

**2020 JUL 13  AM 11:08**
**J.K. "JESS" IRBY, ESQ.**
**CLERK OF COURTS**
**ALACHUA COUNTY, FL**
**FILED**
**CK 88**



# EXHIBIT A

35

Filing # 109785520 E-Filed 07/06/2020 08:57:11 AM

6467

IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
IN AND FOR ALACHUA COUNTY, FLORIDA

DAVID FLORES,

    Plaintiff

v.                                      CASE NO.:

ANTIBIOTIC ADJUVANT, INC.,
a Florida corporation, doing business as SMART STEWARD, INC. and
GAETANO P. LATORRE,

    Defendants.

----------------------------------------/

**SUMMONS**

THE STATE OF FLORIDA
To Each Sheriff of the State:

        **YOU ARE COMMANDED** to serve this Summons and a copy of the Complaint in this action on the
Defendant:

**Antibiotic Adjuvant, Inc.**
**By service on its Director:**
GAETANO P. LATORRE
4416 NW 60th Terrace
Gainesville, Florida 32606

    The Defendant is required to serve written defenses to the Complaint on

JOSEPH C. SHOEMAKER
Florida Bar No. 0319790
Bogin, Munns & Munns, P.A.
628 South 14th Street
Leesburg, FL 34748
(352) 728-3773

the Plaintiff's attorney, within twenty (20) days after service of this Summons on the Defendant, exclusive of the day
of service, and to file the original of the answer on the Clerk of this Court either before service on the Plaintiff's
attorney or immediately thereafter. If the Defendant fails to do so, a default will be entered against the Defendant for
the relief demanded in the Complaint.

       DATED this __6th__ day of ___July___, 2020.

J.K. "JESS" IRBY, ESQ.
Clerk of the Courts

By:  *Christine M. Wilson*
Deputy Clerk

J.K. "JESS" IRBY, ESQ.
CLERK OF THE CIRCUIT COURT
CIVIL DIVISION
201 E UNIVERSITY AVE
GAINESVILLE, FL 32601

Filing # 109785520 E-Filed 07/06/2020 08:57:11 AM

## IN THE CIRCUIT COURT OF THE EIGHTH JUDICIAL CIRCUIT
## IN AND FOR ALACHUA COUNTY, FLORIDA

**DAVID FLORES,**

      **Plaintiff**

v.

                                     **CASE NO.: 01-2020-CA-1792**

                                          **DIVISION J**

**ANTIBIOTIC ADJUVANT, INC.,**
**a Florida corporation, doing business as**
**SMART STEWARD, INC. and**
**GAETANO P. LATORRE,**

      **Defendants.**

_____/

### COMPLAINT

Plaintiff, David Flores, by and through his undersigned counsel, hereby sues Defendants,

Antibiotic Adjuvant, Inc., a Florida corporation, doing business as SmartSteward, Inc. (hereafter

"AAI"), and Gaetano P. LaTorre (hereafter "LaTorre"), and alleges as follows:

### NATURE OF ACTION

1.      Plaintiff brings this action for minimum wage and overtime violations of the Fair

Labor Standards Act of 1938, 29 U.S.C. §201, *et seq.* ("FLSA"), as well as for breach of contract,

quantum meruit, and declaratory relief.

### JURISDICTION, AND VENUE

2.      The amount in controversy exceeds $30,000.00, exclusive of interest, costs, and

attorney's fees.

3.      The venue of this Court is proper because Alachua County is the location where the

cause of action accrued in that the alleged violations of the FLSA and the alleged breach of contract

took place in Alachua County, Florida and the Defendants are located in and/or reside in Alachua

County, Florida.

"2020 CA 001792" 109785520 Filed at Alachua County Clerk 07/06/2020 08:57:18 AM EDT

## PARTIES

4.     Plaintiff is an individual residing in Alachua County, Florida and was engaged in commerce as defined by the FLSA while employed by Defendant.

5.     AAI is a Florida corporation that at all times material hereto conducted business in Alachua County, Florida and had its principal address in Gainesville, Alachua County, Florida.

6.     At all times material hereto, AAI was an enterprise engaged in commerce as defined by the FLSA and was Plaintiff's employer, and/or Plaintiff's joint-employer, as such terms are defined under the FLSA.  AAI was engaged in, inter alia, the design and marketing of software for the medical industry.

7.     LaTorre is an individual residing in Alachua County, Florida that at all times material hereto was the Chairman of the Board and Chief Executive Officer of AAI.

8.     At all times material hereto, LaTorre was acting directly or indirectly in the interest of AAI, in relation to Plaintiff's employment and was substantially in control of the terms and conditions of Plaintiff's work and is therefore considered Plaintiff's statutory employer under the FLSA, along with AAI.

## GENERAL ALLEGATIONS

9.     The Plaintiff signed an Executive Employment Agreement with AAI effective July 12, 2018 (the "First Employment Agreement") under which he would serve as AAI's Chief Executive Officer for an initial base salary of $85,000, possible bonuses, benefits, and stock options. The Plaintiff began working for AAI during March 2018. A true and accurate copy of the First Employment Agreement is attached hereto as Exhibit "A".

10.     During August 2018 the Plaintiff's role with AAI was changed to its Chief Operating Officer, without the consent of the Plaintiff. This change corresponded to AAI's hiring of LaTorre as its CEO.

11.     The Plaintiff signed an Antibiotic Adjuvant Employment Agreement with AAI effective January 29, 2020 (the "Second Employment Agreement") under which he would serve as the Company's Vice President of Customer Success for an initial base salary of $85,000, possible bonuses, benefits, and additional stock options. A true and accurate copy of the Second Employment Agreement is attached hereto as Exhibit "B".

12.     The Plaintiff was paid on a salary basis by AAI at the onset of his employment with AAI and AAI, for a period of time, continued to pay the Plaintiff a salary.

13.     However, from about July 26, 2019 until the conclusion of Plaintiff's employment with AAI on or about May 18, 2020, the Plaintiff continued to work numerous hours on behalf of AAI, but was not paid any compensation whatsoever by AAI during this period (hereafter the "Uncompensated Period").

14.     During the Uncompensated Period the Plaintiff often worked in excess of forty (40) hours per week for AAI.

15.     During the Uncompensated Period the Defendants did not pay Plaintiff the minimum wage required by law under the FLSA and did not pay him at a rate of time and a half for those hours worked in excess of forty (40) hours per week during this period.

16.     During the Uncompensated Period the Plaintiff was a non-exempt employee as that term is defined by the overtime provisions of the FLSA.

17.     The Defendants did not maintain an accurate record of the hours Plaintiff worked during the Uncompensated Period.

18.     The Plaintiff's work for AAI, during the Uncompensated Period and otherwise, entailed numerous occasions of interstate travel, such as to California, Maryland, New York, and Washington, D.C., and interstate telephone, e-mail communications, U.S. mail, and delivery

services, such as to California and Virginia, for conferences, business development, and sales purposes.

19.     For unknown reasons, on or about May 11th, 2020, LaTorre and other corporate officers of AAI, began departure discussions with the Plaintiff and such discussions continued until approximately May 18, 2020 when AAI terminated the employment of the Plaintiff without cause.

20.     On May 18, 2020 LaTorre, on behalf of AAI, sent the Plaintiff a discharge letter (the "Discharge Letter"). A true and accurate copy of the Discharge Letter, with terms of a settlement proposal from AAI redacted, is attached hereto as Exhibit "C".

21.     As the terms of the Discharge Letter were unacceptable to the Plaintiff, the Plaintiff sought to discuss possible resolution of the issues in this matter with LaTorre thereafter, but the parties were unable to resolve their disputes.

22.     At all times material hereto, Plaintiff performed the essential functions of his job in a professional and competent manner.

23.     All conditions precedent to the bringing of this action have been performed, have occurred, or were waived.

24.     The Plaintiff has the retained the undersigned lawyer and law firm to represent his interests in this action, and is obligated to pay a reasonable fee for such services.

## COUNT I
## VIOLATION OF THE MINIMUM WAGE PROVISIONS OF THE FLSA
## (AGAINST ALL DEFENDANTS)

25.     Plaintiff re-alleges and incorporates by reference all allegations contained in paragraphs 1 through 24, supra.

26.     Defendants repeatedly and willfully violated the FLSA by failing to compensate Plaintiff at a rate not less than the minimum wage allowed by the FLSA.

27.     As a direct and proximate result of Defendants' acts, Plaintiff suffered damages.

28.     The Plaintiff is entitled to an award of reasonable attorney fees and costs if he prevails on this claim pursuant to § 216(b) of the FLSA.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for unpaid wages found to be due and owing; an additional equal amount as liquidated damages; pre-judgment interest, attorney's fees and costs; and such other relief as the Court deems just and equitable.

## COUNT II
## VIOLATION OF THE OVERTIME PROVISIONS OF THE FLSA
## (AGAINST ALL DEFENDANTS)

29.     Plaintiff re-alleges and incorporates by reference all allegations contained in paragraphs 1 through 24, supra.

30.     Defendants repeatedly and willfully violated the FLSA by failing to compensate Plaintiff at a rate not less than one and one-half times the regular rate at which he was employed for workweeks longer than forty (40) hours.

31.     As a direct and proximate result of Defendants' acts, Plaintiff suffered damages.

32.     The Plaintiff is entitled to an award of reasonable attorney fees and costs if he prevails on this claim pursuant to § 216(b) of the FLSA.

WHEREFORE, Plaintiff demands judgment against Defendants, jointly and severally, for unpaid overtime wages found to be due and owing; an additional equal amount as liquidated damages; pre-judgment interest; attorney's fees and costs; and such other relief as the Court deems just and equitable.

## COUNT III – BREACH OF CONTRACT
### (AS TO THE FIRST EMPLOYMENT AGREEMENT)
### (AGAINST AAI)

33.     Plaintiff re-alleges and incorporates by reference all allegations contained in paragraphs 1 through 24, supra.

34.     This is an action for breach of a written contract, namely the First Employment Agreement.

35.     The Second Employment Agreement appears to have been an attempt to either modify the First Employment Agreement and/or function as an accord.

36.     While not specifically stated as such, the Second Employment Agreement appears to waive rights of the Plaintiff pursuant to the FLSA in that AAI is not required to pay the Plaintiff for services rendered to AAI pursuant to the terms of the Second Employment Agreement.

37.     The rights afforded to employees pursuant to the FLSA cannot be properly waived.

38.     A recent summarization of the law on this issue was provided by the Third District in Martinez v. Ford Midway Mall, Inc., 59 So. 3d 168, 173 (Fla. 3d DCA 2011):

> "It has been long established that the statutory rights under the FLSA cannot be waived by an employee. *See Sosnowy v. A. Perri Farms, Inc.*, No. 10-CV-2829, 764 F. Supp. 2d 457, 2011 U.S. Dist. LEXIS 13702, 2011 WL 488692, at *10 (E.D.N.Y. February 10, 2011) ("It is well-established that parties cannot contract for lesser protections than the FLSA, which sets the lower limit for overtime compensation."); *Fuentes v. CAI Int'l., Inc.*, 728 F.Supp.2d 1347, 1354 (S.D. Fla. 2010) ('Because the FLSA requires overtime compensation for hours worked in excess of 40, which cannot be contractually abridged or waived, the plaintiff's contractual waiver of overtime in the Release and Waiver of Overtime Compensation is preempted by the FLSA.')."

39.     Accordingly, the Second Employment Agreement is contrary to federal law as it applies to AAI's requirement to pay the Plaintiff and clearly contrary to public policy.

40.     In this regard, the Second Employment Agreement should be determined to be both unenforceable and void and AAI should properly be required to honor its obligations pursuant to the First Employment Agreement.

41.     AAI breached the First Employment Contract by failing to properly pay Plaintiff for all services rendered by the Plaintiff for AAI as previously set forth herein.

42.     As a result of AAI's breach of the First Employment Agreement, the Plaintiff has been damaged.

43.     As this is a claim for wages, the Plaintiff is entitled to an award of attorney's fees and costs if he prevails as to this claim pursuant to Florida Statutes § 448.110.

WHEREFORE the Plaintiff demands judgment against Defendant Antibiotic Adjuvant, Inc. for damages; pre-judgment interest; reasonable attorney fees and costs; and such other relief as the Court deems just and equitable.

## COUNT IV - QUANTUM MERUIT
### (PLEAD IN THE ALTERNATIVE TO COUNTS I, II & III)
### (AGAINST AAI)

44.     Plaintiff re-alleges and incorporates by reference all allegations contained in paragraphs 1 through 23, supra.

45.     This is an action for *quantum meruit* against Defendant AAI.

46.     Plaintiff rendered valuable services to AAI during the Uncompensated Period that were accepted by AAI and that resulted in a benefit to AAI.

47.     Plaintiff is entitled to recover the reasonable value of the benefit conferred upon AAI since it would be contrary to the principles of equity and good conscience for AAI to retain the benefit.

WHEREFORE, Plaintiff demands judgment against Defendant Antibiotic Adjuvant, Inc. for damages; pre-judgment interest; costs; and any other and further relief as the Court deems just and proper.

## COUNT V – DECLARATORY JUDGMENT
## (AS TO THE SECOND EMPLOYMENT AGREEMENT)

48.      Plaintiff re-alleges and incorporates by reference all allegations contained in paragraphs 1 through 23, supra.

49.      This is an action for declaratory judgment pursuant to Chapter 86 of the Florida Statutes, requiring the declaration of rights regarding the validity of the Second Employment Agreement.

50.      While not specifically stated as such, the Second Employment Agreement appears to waive rights of the Plaintiff pursuant to the FLSA in that AAI is not required to pay the Plaintiff for services rendered to AAI pursuant to the terms of the Second Employment Agreement.

51.      The rights afforded to employees pursuant to the FLSA cannot be properly waived.

52.      A recent summarization of the law on this issue was provided by the Third District in Martinez v. Ford Midway Mall, Inc., 59 So. 3d 168, 173 (Fla. 3d DCA 2011):

> "It has been long established that the statutory rights under the FLSA cannot be waived by an employee. See Sosnowy v. A. Perri Farms, Inc., No. 10-CV-2829, 764 F. Supp. 2d 457, 2011 U.S. Dist. LEXIS 13702, 2011 WL 488692, at *10 (E.D.N.Y. February 10, 2011) ("It is well-established that parties cannot contract for lesser protections than the FLSA, which sets the lower limit for overtime compensation."); Fuentes v. CAI Int'l., Inc., 728 F.Supp.2d 1347, 1354 (S.D. Fla. 2010) ('Because the FLSA requires overtime compensation for hours worked in excess of 40, which cannot be contractually abridged or waived, the plaintiff's contractual waiver of overtime in the Release and Waiver of Overtime Compensation is preempted by the FLSA.')."

53.      Accordingly, the Second Employment Agreement is contrary to federal law as it applies to AAI's requirement to pay the Plaintiff and clearly contrary to public policy.

54.     Plaintiff seeks a determination by this Court as to the validity of the Second
Employment Agreement in light of the unlawful FLSA waiver noted herein.

55.     The parties have present actual, present, adverse and antagonistic interest in the issues set
forth herein, and are in need of a declaration of their rights under Chapter 86, Fla. Stat.

56.     This action is not brought merely for obtaining legal advice or to have this matter
determined by the Court as a matter of curiosity.

WHEREFORE, Plaintiff requests that this Court enter a Final Declaratory Judgment
determining that the Second Employment Agreement is unenforceable and void, in whole or in
part, and determining the rights of the parties as to Second Employment Agreement; providing
supplemental relief consistent with its determinations; and that this Court make such further
determinations and enter such further relief this Court may deem necessary and proper, including
such costs as are equitable.

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands a jury trial on and for all issues so triable.

Respectfully submitted,

/s Joseph C. Shoemaker
JOSEPH C. SHOEMAKER
Florida Bar No. 0319790
Bogin, Munns & Munns, P.A.
628 S. 14th St.
Leesburg, Florida 34748
Telephone:  (352) 728-3773
Facsimile:  (352) 728-5488
jshoemaker@boginmunns.com primary email
bmmservice@boginmunns.com secondary email
thammond@boginmunns.com secondary email
Attorneys for Plaintiff

# EXHIBIT "A"

## EXECUTIVE EMPLOYMENT AGREEMENT

This **EXECUTIVE EMPLOYMENT AGREEMENT** (this "Agreement") is entered into and made effective as of July 12, 2018, ("Effective Date"), by and between **David Flores** a Florida resident ("Executive"), and **Antibiotic Adjuvants, Inc.** a Florida Corporation] having a place of business in Gainesville, Florida ("Company"), with reference to the following:

1. **Employment**

Company shall employ Executive and Executive shall serve as the Chief Executive Officer of Company for an initial period of four years, commencing as of March 8, 2018. In that position, Executive shall report to Company's Board of Directors and shall render to Company the services, and shall have the duties and responsibilities, that are set forth in the job description attached hereto as Exhibit A, and such other duties as the Board of Directors reasonably directs from time to time (to the extent that such duties are commensurate with Executive's title and position with Company). Executive shall devote his entire business and professional time, attention, skill, and energy exclusively to the business of Company, shall use his best efforts to promote the success of Company's business, and shall cooperate fully in the advancement of the best interests of Company.

Company shall have the right at any time to reassign Executive to serve in an executive position other than as Chief Executive Officer. Any such reassignment shall not affect the compensation or benefits provided, except as stated herein.

2. **Compensation and Benefits**

a. Base Salary. Company shall pay Executive during his employment under this Agreement an initial base salary of $85,000 per annum ("Base Salary"). The Base Salary shall be payable on Company's regular payroll schedule for executive employees as it may change from time to time. The Base Salary shall be reviewed by Company annually and may be adjusted by Company in its sole discretionDiscretionary Bonus Compensation.

(i)     For each fiscal year ending after the first anniversary hereof, provided Executive is employed hereunder on the last day of each such fiscal year, Executive will be eligible to receive a discretionary bonus in an amount commensurate with Executive's position and tenure and determined on a basis comparable to similarly situated executives (the "Discretionary Bonus"), which amount will be determined by the Company in its sole and absolute discretion.

**EXECUTIVE EMPLOYMENT AGREEMENT**

(ii)     The Discretionary Bonus, if any, will be paid at the same time as incentive payments are paid to other executives of similar responsibility.

b.     Equity Compensation. Executive may be awarded such equity incentive compensation as may be reflected in the Equity Grant Provisions that are attached hereto as Exhibit B and incorporated herein by reference ("Equity Compensation").

c.     Reimbursement for Business Expenses.   Company will reimburse Executive for reasonable entertainment, travel, lodging, and other miscellaneous expenses incurred on Company's behalf and directly related to the performance of Executive's duties hereunder, but solely to the extent such expenses are pre-approved by Supervisor.  Executive will submit documentation of the expenses incurred in a form provided by Company.

d.     Executive Employee Benefits.  Executive will be eligible to participate in employee benefit plans and other benefits that Company makes available to other executives of similar responsibility pursuant to the terms of applicable plans and other governing documents, as they may be amended from time to time in Company's sole discretion.  A comprehensive description of the benefits available to Executive as of the Effective Date is set forth on Exhibit B hereto.

e.     Vacation and Leaves.  Executive will be entitled to 20 days per year of vacation time, which shall accrue at the rate of one twelfth (1/12th) such days per completed calendar month of employment, and such other leaves as are provided for executive employees under Company's policies and procedures.   To the extent practicable, executive shall coordinate all vacation and other leave with Supervisor in advance.

3.     **Termination of Employment**

Executive's employment with Company may be terminated immediately at any time and for any lawful reason or for no reason by Company upon written notice to Executive, or by Executive upon reasonable written notice to Company, or automatically as a result of Executive's death or disability from which recovery is not expected to occur within six months.  Except as otherwise expressly provided in this Agreement (including Executive's continuing post-termination obligations hereunder) or required by law, Company's obligations under this Agreement shall automatically terminate upon the termination of Executive's employment with Company and Executive shall have no obligation or duty to further provide services to Company in any capacity, nor will Company be under any obligation to make any further payments or provide further benefits to Executive except as expressly provided for hereunder or otherwise by applicable law.

**EXECUTIVE EMPLOYMENT AGREEMENT**

4.   **Termination Payments**

a.   <u>Release and Waiver of Claims Required</u>. Upon the termination of Executive's employment, Company will be obligated to provide Executive only with such compensation as expressly provided in this paragraph 4, and only upon the execution by Executive of a release and waiver of all claims Executive may have against Company and related parties.

b.   <u>Termination for Good Cause</u>. If Company terminates Executive's employment hereunder for Good Cause (as defined below), or if Executive resigns or retires at any time for any reason other than Good Reason (as defined below), Executive will receive Base Salary through the effective date of such termination.

c.   <u>Definition of Good Cause</u>. Executive will be considered to be terminated for "<u>Good Cause</u>" if he is terminated because of: (i) Executive's material breach of this Agreement or any related agreement between the Parties; (ii) Executive's willful failure to adhere to any written Company policy if Executive has been given a reasonable opportunity to comply with such policy and cure his failure to comply; (iii) Executive's willful failure to perform Executive's duties under this Agreement if Executive has been given a reasonable opportunity to cure such failure to perform; (iv) the actual or attempted appropriation of a material business opportunity of Company, including the actual or attempted securing of any personal profit at Company's expense in connection with any transaction; (v) any material act of gross disloyalty to Company; (vi) the actual or attempted misappropriation of any of Company's funds or property; or (vii) the conviction of, or the entering of a guilty plea or plea of no contest with respect to, a felony or the equivalent thereof, any crime of fraud, theft, forgery, or deceit, or any crime with respect to which imprisonment for longer than 30 days is a likely punishment.

d.   <u>Termination Without Cause</u>. If Company terminates Executive's employment hereunder for any reason other than Good Cause, or if Executive resigns his employment for Good Reason (defined below), then Executive will be entitled to receive: (i) Base Salary through the date that is 120 days after the date of termination as per Company's regular payroll schedule; (ii) reimbursement of COBRA group health insurance continuation premiums, if any, until the first to occur of (A) the passage of 18 months, or (B) Executive's becoming eligible for other group health insurance coverage. All payments are subject to applicable payroll and withholding taxes and any other withholding authorized by Executive.

e.   <u>Definition of Good Reason</u>. Executive shall be considered to have resigned for "<u>Good Reason</u>" in the event of, without the Executive's written consent: (i) a substantial and prolonged reduction in Base Salary; (ii) any material breach of this Agreement by Company that was not cured after Company was given a reasonable

**EXECUTIVE EMPLOYMENT AGREEMENT**

opportunity to cure; (iv) Company's requiring Executive to relocate to a location more than 50 miles from Gainesville, Florida or (v) an unsuccessful or misguided attempt by Company to terminate the Executive for Good Cause.

      f.     <u>Termination Upon Death</u>.   Executive's employment hereunder automatically terminates upon the death of Executive. In that event, Executive's estate will be entitled to receive the Base Salary through the end of the calendar month during which Executive's death occurs, together with such other compensation, if any, as may be set forth on applicable agreements between Company and Executive.

      g.     <u>Termination Upon Disability</u>.  If Executive's employment terminates by reason of Executive's disability, as it may be determined under any of Company's disability plans then applicable to Executive, Executive will be paid in accordance with any disability plans or policies of Company then in existence and applicable to Executive and as may be set forth on applicable agreements between Company and Executive.

      h.     <u>Equity Compensation</u>.  Executive's vesting and other post-termination rights to maintain possession of Equity Compensation, if any, regardless of the reason for termination, shall be as set forth on Exhibit B.

      i.     <u>Contingency</u>. Any and all payments to Executive under this paragraph 4 are contingent on Executive's continuing compliance with the covenants and other provisions in paragraph 5 hereof and the agreements referenced therein.

5.     **<u>Executive's Covenants Protecting Company's Business Resources</u>**

Executive is signatory to that certain Intellectual Property Agreement of even date herewith, which is attached hereto as Exhibit C and which is hereby incorporated herein by reference. Executive's employment with Company and right to receive any compensation whatsoever from Company shall be contingent in all respects with Executive's compliance with the Intellectual Property Agreement.

6.     **<u>General</u>**

      a.     <u>Successors and Assigns</u>. This Agreement will be binding upon and inure to the benefit of: (i) Company and its successors and assigns; and (ii) Executive and Executive's heirs and personal representatives. This Agreement is personal in nature Executive may not assign or transfer any of his obligations hereunder.

      b.     <u>Entire Agreement; Modification</u>. This Agreement, together with its Exhibits and other agreements attached and/or incorporated herein, contains the entire agreement of the Parties about the subjects in it, and it replaces all prior, oral or written agreements, understandings, statements, representations, and promises by either party.

**EXECUTIVE EMPLOYMENT AGREEMENT**

No supplement, modification, or amendment to this Agreement will be effective and binding unless the same is contained in writing accepted and duly executed by the Parties.

c. <u>Paragraph Headings</u>. The paragraph headings used in this Agreement are included solely for convenience and will not affect, or be used in connection with, the interpretation of this Agreement.

d. <u>Severability</u>. The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.

e. <u>Governing Law</u>. This Agreement will, except to the extent that federal law will be deemed to apply, be governed by and construed and enforced in accordance with the laws of Florida.

f. <u>Arbitration of Certain Disputes</u>. All disputes hereunder will be settled conclusively and without right of appeal by arbitration in Gainesville, Florida before a single arbitrator pursuant to the Employment Dispute Rules of the American Arbitration Association ("<u>AAA</u>"). The arbitrator will be selected by the joint agreement of the parties, but if they do not so agree within 10 calendar days after notice from either party to the other that it is instituting arbitration, they will request from the AAA a panel of 5 arbitrators from which the Parties will alternately strike names until a single arbitrator has been selected. The initial strike will be determined by the flip of a coin. Each party will pay its own expenses of arbitration and the expenses of the arbitrator will be equally shared provided that, if in the opinion of the arbitrator any claim, defense, or argument raised in the arbitration was unreasonable, the arbitrator may assess all or part of the expenses of the other party (including reasonable attorneys' fees) and of the arbitrator as the arbitrator deems appropriate. The arbitrator may not award either party punitive or consequential damages. Notwithstanding the foregoing, Company may seek immediate injunctive relief from a court of competent jurisdiction without necessity of posting bond to forestall Executive's actual or threatened breach of paragraph 5 hereof. Executive hereby consents to the exclusive jurisdiction of, and waive any objection to venue in, such courts.

**EXECUTIVE EMPLOYMENT AGREEMENT**

g.   NO CONFLICT.   BY EXECUTING THIS AGREEMENT, EXECUTIVE HEREBY REPRESENTS AND WARRANTS TO COMPANY THAT EXECUTIVE IS NOT PRECLUDED BY ANY AGREEMENT (WHETHER WRITTEN OR ORAL), OR ANY FIDUCIARY OR CONTRACTUAL RESTRICTIONS WHATSOEVER FROM ACCEPTING THIS OFFER AND FULFILLING THE RESPONSIBILITIES REQUIRED UNDER THE TERMS OF THIS AGREEMENT.   EXECUTIVE FURTHER UNDERSTANDS THAT EXECUTIVE'S SIGNATURE BELOW CONSTITUTES EXECUTIVE'S AFFIRMATIVE REPRESENTATION, WHICH EXECUTIVE UNDERSTANDS WILL BE RELIED UPON BY COMPANY, THAT THERE ARE NO SUCH RESTRICTIONS.

**for Company:**

    ROBERT YANCEY
printed name

signature    7/24/18

**for Executive:**

    DAVID FLORES
printed name

signature    7/24/18

## EXHIBIT A

## PRIMARY RESPONSIBILITIES

Executive shall provide the principal leadership for the Company. He shall be responsible for management of the Company's business, and he will provide overall direction for the Company's activities and the activities and performance of its employees. He will develop and execute a strategic plan for the Company moving forward.

Executive will lead efforts to secure initial and future financing needs of the Company. He will develop operating budgets for review and approval by the Company's Board of Directors, and he will be responsible for maintaining a fiscal discipline that adheres to the approved spending plans of the budget.

Executive shall take an active role in recruiting and hiring key personnel. He will provide the Board of Directors with recommended bonus plans and stock option programs for the Board's action.

EXECUTIVE EMPLOYMENT AGREEMENT

## EXHIBIT B

## EQUITY GRANT PROVISIONS

Executive has received grants for a total of 500,000 options to acquire Company common shares.  The grant of 350,000 stock options exercisable at $0.01 per share shall vest according to the following schedule:

| | |
|---|---|
| 87,500 options | October 15, 2018 |
| 262,500 options | 1/36th of these options shall vest on the 15th of each succeeding month after October 15, 2018 |

The grant of 150,000 stock options exercisable at $0.15 per share shall vest according to the following schedule:

| | |
|---|---|
| 37,500 options | March 7, 2019 |
| 112,500 options | 1/36th of these options shall vest on the 7th of each succeeding month after March 7, 2019 |

**EXECUTIVE EMPLOYMENT AGREEMENT**

**EXHIBIT C**

**INTELLECTUAL PROPERTY AGREEMENT**

*Attached*

# EXHIBIT "B"

## ANTIBIOTIC ADJUVANT EMPLOYMENT AGREEMENT

This **EMPLOYMENT AGREEMENT** (this "Agreement") is entered into and made effective as of January 29th 2020 ("Effective Date"), by and between **Mr. David Flores,** a Gainesville Florida resident ("Executive"), and **Antibiotic Adjuvant, Inc.** a Florida Corporation] having a place of business in Gainesville, Florida ("Company").

1. **Replacement of Prior Agreements:**

This Agreement replaces and supersedes any prior compensation agreement or benefit arrangement, excluding any stock option agreements, between the Company and the Executive, including without limitation the previous Employment Agreement dated July 12th, 2018. The Executive hereby waives any and all claims that may exist on the date this Agreement is signed, including, but not limited to, contingent claims, arising from any previous oral or written agreement between the parties.

2. **Employment:**

Company shall employ Executive and Executive shall serve as Vice President of Customer Success of Company for an initial period of two (2) years, commencing as of October 15th, 2019. In that position, Executive shall report to Company's CEO and shall render to Company the services, and shall have the duties and responsibilities, that are set forth in the job description attached hereto as Exhibit A, and such other duties as the CEO reasonably directs from time to time (to the extent that such duties are commensurate with Executive's title and position with Company). From the execution date of this agreement and until the Company has received an equity investment of $1,000,000 or more dollars, the Executive shall devote a minimum of 20 hrs. per week of their professional time, attention, skill, and energy exclusively to the business of the Company, shall use their best efforts to promote the success of Company's business, and shall cooperate fully in the advancement of the best interests of Company. Once an equity investment of $1,000,000 or more dollars is made into the Company, Executive shall devote his entire business and professional time, attention, skill, and energy exclusively to the business of the Company, shall use his best efforts to promote the success of Company's business, and shall cooperate fully in the advancement of the best interests of the Company.

3. **Compensation and Benefits:**

Base Salary. Your initial Base Salary will be at least $85,000 per year once the Company receives equity investment of $1,000,000 or more on the Company's next equity financing round.

    a. Once initiated, the Base Salary shall be payable on Company's regular payroll schedule for executive Executives as it may change from time to time. The Base Salary shall be reviewed by the Company and may be adjusted by Company at any time, in its sole discretion, to reflect a compensation more commensurate with Executive's position and experience.

**EXECUTIVE EMPLOYMENT AGREEMENT**

b. For each fiscal year ending after the first anniversary hereof, provided Executive is employed hereunder on the last day of each such fiscal year, Executive will be eligible to receive a discretionary bonus in an amount commensurate with Executive's position and tenure and determined on a basis comparable to similarly situated executives (the "Discretionary Bonus"), which award and amount will be determined by the Company in its sole and absolute discretion. The Discretionary Bonus, if any, will be paid at the same time as incentive payments are paid to other Executive's of similar responsibility.

c. The Executive had been previously awarded equity compensation by the Board of Directors of the Company and the Executive may be awarded additional equity incentive compensation as may be reflected in the Equity Grant Provisions that are attached hereto as Exhibit B and incorporated herein by reference ("Equity Compensation").

d. Reimbursement for Business Expenses. Company will reimburse Executive for reasonable entertainment, travel, lodging, and other miscellaneous expenses incurred on Company's behalf and directly related to the performance of Executive's duties hereunder. Executive will submit documentation of the expenses incurred in a form provided by Company.

e. Executive Benefits. Executive will be eligible to participate in Employee benefit plans and other benefits that Company makes available to other executives of similar responsibility pursuant to the terms of applicable plans and other governing documents, as they may be amended from time to time in Company's sole discretion.

f. Without limiting the foregoing provisions of Section 3(F), the Company shall make available a High Deductible Health Plan (HDHP) and associated Health Savings Accounts to Company employees who are full time U.S. employees and who participate in once the Company receives an equity investment of $1,000,000 or more on the Company's next equity financing round.

g. Vacation and Leaves. Executive will be entitled to 20 days per year of vacation time, which shall accrue at the rate of one twelfth ($1/12^{th}$) such days per completed calendar month of employment, and such other leaves as are provided for executive employees under Company's policies and procedures. To the extent practicable, Executive shall coordinate all vacation and other leave with Supervisor in advance.

4. **Termination of Employment:**

Executive's employment with Company may be terminated immediately at any time and for any lawful reason or for no reason by Company upon written notice to Executive, or by Executive upon reasonable written notice to Company, or automatically as a result of Executive's death or disability from which recovery is not expected to occur within six months. Except as otherwise

**EXECUTIVE EMPLOYMENT AGREEMENT**

expressly provided in this Agreement (including Executive's continuing post-termination obligations hereunder) or required by law, Company's obligations under this Agreement shall automatically terminate upon the termination of Executive's employment with Company and Executive shall have no obligation or duty to further provide services to Company in any capacity, nor will Company be under any obligation to make any further payments or provide further benefits to Executive except as expressly provided for hereunder or otherwise by applicable law.

5.  **Termination & Payments:**

   a. <u>Release and Waiver of Claims Required</u>. Upon the termination of Executive's employment, Company will be obligated to provide Executive only with such compensation as expressly provided in this paragraph 5, and only upon the execution by Executive of a release and waiver of all claims Executive may have against Company and related parties.

   b. <u>Termination for Good Cause</u>. If Company terminates Executive's employment hereunder for Good Cause (as defined below), or if Executive resigns or retires at any time for any reason other than Good Reason (as defined below), Executive will receive Base Salary through the effective date of such termination.

   c. <u>Definition of Good Cause</u>. Executive will be considered to be terminated for "<u>Good Cause</u>" if he is terminated because of: (i) Executive's material breach of this Agreement or any related agreement between the Parties; (ii) Executive's willful failure to adhere to any written Company policy if Executive has been given a 30-day cure period to comply with such policy and cure his failure to comply.; (iii) Executive's willful failure to perform Executive's duties under this Agreement if Executive has been given a 30-day cure period to cure such failure to perform; (iv) the actual or attempted appropriation of a material business opportunity of Company, including the actual or attempted securing of any personal profit at Company's expense in connection with any transaction; (v) any material act of gross disloyalty to Company; (vi) the actual or attempted misappropriation of any of Company's funds or property; or (vii) the conviction of, or the entering of a guilty plea or plea of no contest with respect to, a felony or the equivalent thereof, any crime of fraud, theft, forgery, or deceit, or any crime with respect to which imprisonment for longer than 30 days is a likely punishment.

   d. <u>Termination Without Cause</u>. If Company terminates Executive's employment hereunder for any reason other than Good Cause, or if Executive resigns his employment for Good Reason (defined below), then Executive will be entitled to receive: (i) Base Salary through the date that is 120 days after the date of termination as per Company's regular payroll schedule; (ii) reimbursement of COBRA group health insurance continuation premiums, if any, until the first to occur of (A) the passage of 12 months, or (B) Executive's becoming eligible for other group health insurance

**EXECUTIVE EMPLOYMENT AGREEMENT**

coverage. All payments are subject to applicable payroll and withholding taxes and any other withholding authorized by Executive.

 e. <u>Definition of Good Reason</u>. Executive shall be considered to have resigned for "<u>Good Reason</u>" in the event of, without the Executive's written consent: (i) a substantial and prolonged reduction in Base Salary; (ii) any material breach of this Agreement by Company that was not cured after Company was given a reasonable opportunity to cure; (iv) Company's requiring Executive to relocate to a location more than 50 miles from Gainesville, Florida or (v) an unsuccessful or misguided attempt by Company to terminate the Executive for Good Cause.

 f. <u>Termination Upon Death</u>. Executive's employment hereunder automatically terminates upon the death of Executive. In that event, Executive's estate will be entitled to receive the Base Salary through the end of the calendar month during which Executive's death occurs, together with such other compensation, if any, as may be set forth on applicable agreements between Company and Executive.

 g. <u>Termination Upon Disability</u>. If Executive's employment terminates by reason of Executive's disability, as it may be determined under any of Company's disability plans then applicable to Executive, Executive will be paid in accordance with any disability plans or policies of Company then in existence and applicable to Executive and as may be set forth on applicable agreements between Company and Executive.

6. **<u>Equity Compensation</u>:**

Executive's vesting and other post-termination rights to maintain possession of Equity Compensation, if any, regardless of the reason for termination, shall be as set forth on Exhibit B.

 a. <u>Contingency</u>. Any and all payments to Executive under this paragraph 6 are contingent on Executive's continuing compliance with the covenants and other provisions in paragraph 7 hereof and the agreements referenced therein

7. **<u>Executive's Covenants Protecting Company's Business Resources</u>:**

 a. <u>Nondisclosure</u>. The Executive shall not at any time divulge, communicate or use to the detriment of the Company or for the benefit of any other person or persons, or misuse in any way, any Confidential Information (as hereinafter defined) pertaining to the business of the Company. Any Confidential Information or data now or hereafter acquired by the Executive with respect to the business of the Company (which shall include, but not be limited to, information concerning the Company's business plan, financial condition, prospects, technology, computer code, customers, suppliers, sources of leads and methods of doing business) shall be deemed a valuable, special and unique asset of the Company that is received by the Executive in confidence and as a fiduciary, and Executive shall remain a fiduciary to the Company with respect to all

**EXECUTIVE EMPLOYMENT AGREEMENT**

of such information. For purposes of this Agreement, "Confidential Information" means information disclosed to the Executive or known by the Executive as a consequence of or through his employment by the Company (including information conceived, originated, discovered or developed by the Executive) prior to or after the date hereof, and not generally known, about the Company or its business.

b. <u>Non-solicitation of Employees.</u> During the Employment Period and for a period of twenty twelve (12) months thereafter, Executive shall not directly or indirectly, for himself or for any other person, firm, corporation, partnership, association or other entity, attempt to employ or enter into any contractual arrangement with any employee of the Company or former Executive of the Company, unless such Executive or former has not been employed by the Company for a period in excess of twelve (12) months.

c. <u>Non-Competition.</u> At all times while the Executive is employed by the Company and for a one (1) year period after the termination of the Executive's employment with the Company for any reason other than by the Company without Cause (as defined in Section 4(d) hereof) or by the Executive for Good Reason (as defined in Section 4(e) hereof), the Executive shall not, directly or indirectly, engage in or have any interest in any sole proprietorship, partnership, Company or business or any other person or entity (whether as an Executive, officer, director, partner, agent, consultant, software developer or otherwise) that directly or indirectly (or through any affiliated entity) engages in competition with the Company (for this purpose, any business that engages in the Medical Information Technology (MIT) or medical software business who's customers include Skilled Nursing facilities, Long Term Care facilities, hospitals and walk-in clinics) during his term of employment or after the Executives termination.

d. <u>Mutual Non-Disparagement.</u> Executive agrees that he will not, directly or indirectly, individually or in concert with others, engage in any conduct or make any statement that is likely to have the effect of undermining or disparaging the reputation of the Company, or their good will, products, or business opportunities, or that is likely to have the effect of undermining or disparaging the reputation of any officer, director, agent, representative or Executive, past or present, of the Companies.

The Company agrees that, except for circumstances relating to a termination of Executive's employment for Cause, its Executive officers or directors shall not directly or indirectly, individually or in concert with others, engage in any conduct or make any statement that is likely to have the effect of undermining or disparaging the reputation of the Executive.

**EXECUTIVE EMPLOYMENT AGREEMENT**

8. **Intellectual Property:**

The Executive hereby assigns to the Company all rights, including, without limitation, copyrights, patents, trade secret rights, and other intellectual property rights associated with any ideas, concepts, techniques, inventions, processes, works of authorship, Confidential Information or trade secrets (i) developed or created by the Executive, solely or jointly with others, during the course of performing work for or on behalf of the Company or any affiliate of the Company, or the predecessors of any such entities, whether as an Executive or independent contractor, (ii) that the Executive conceives, develops, discovers or makes in whole or in part during the Executive's employment by the Company that relate to the business of the Company or any affiliate of the Company or the actual or demonstrably anticipated research or development of the Company or any affiliate of the Company, (iii) that the Executive conceives, develops, discovers or makes in whole or in part during or after the Executive's employment by the Company that are made through the use of any of the equipment, facilities, supplies, trade secrets or time of the Company or any affiliate of the Company, or that result from any work the Executive performs for the Company or any affiliate of the Company, or (iv) developed or created by the Executive, solely or jointly with others, at any time before the Employment Period, that relate to or involve the Company's businesses (including, but not limited to, the business of the Company Group) (collectively, the "Work Product"). Without limiting the foregoing, to the extent possible, all software, compilations and other original works of authorship included in the Work Product will be considered a "work made for hire" as that term is defined in Title 17 of the United States Code. If, notwithstanding the foregoing, the Executive for any reason retains any right, title or interest in or relating to any Work Product, the Executive agrees promptly to assign, in writing and without any requirement of further consideration, all such right, title, and interest to the Company. Upon request of the Company at any time during or after the Employment Period, the Executive will take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to evidence, perfect, record or otherwise give full and proper effect to any assignments of rights under or pursuant to this Agreement.

9. **Indemnification and D&O Insurance:**

The Company will defend, hold harmless and indemnify Executive for and against any and all claims arising in any way from the performance of services under this Agreement, and will do so to the maximum extent required by law, as permitted or required by the Company's and its subsidiaries' and affiliates' Articles of Incorporation or Bylaws or other governing documents, and under any insurance policies applicable to the Company's officers or directors or Executives. The Company agrees to maintain appropriate insurance coverage and to name Executive as an insured under such policies. Any defense or indemnification provided by law or pursuant to an applicable insurance policy will be governed by the terms of the applicable statute, regulation or policy.

**EXECUTIVE EMPLOYMENT AGREEMENT**

10. **General**

    a. <u>Successors and Assignees</u>.  This Agreement will be binding upon and inure to the benefit of: (i) Company and its successors and assignees; and (ii) Executive and Executive's heirs and personal representatives.  This Agreement is personal in nature Executive may not assign or transfer any of his obligations hereunder.

    b. <u>Entire Agreement; Modification</u>.  This Agreement, together with its Exhibits and other agreements attached and/or incorporated herein, contains the entire agreement of the Parties about the subjects in it, and it replaces all prior, oral or written agreements, understandings, statements, representations, and promises by either party.  No supplement, modification, or amendment to this Agreement will be effective and binding unless the same is contained in writing accepted and duly executed by the Parties.

    c. <u>Paragraph Headings</u>.  The paragraph headings used in this Agreement are included solely for convenience and will not affect, or be used in connection with, the interpretation of this Agreement.

    d. <u>Severability</u>.  The provisions of this Agreement will be deemed severable and the invalidity or unenforceability of any provision will not affect the validity or enforceability of the other provisions hereof.

    e. <u>Governing Law</u>.  This Agreement will, except to the extent that federal law will be deemed to apply, be governed by and construed and enforced in accordance with the laws of Florida.

    f. <u>Arbitration of Certain Disputes</u>.  All disputes hereunder will be settled conclusively and without right of appeal by arbitration in Gainesville, Florida before a single arbitrator pursuant to the Employment Dispute Rules of the American Arbitration Association ("<u>AAA</u>").  The arbitrator will be selected by the joint agreement of the parties, but if they do not so agree within 10 calendar days after notice from either party to the other that it is instituting arbitration, they will request from the AAA a panel of 5 arbitrators from which the Parties will alternately strike names until a single arbitrator has been selected.  The initial strike will be determined by the flip of a coin.  Each party will pay its own expenses of arbitration and the expenses of the arbitrator will be equally shared provided that, if in the opinion of the arbitrator any claim, defense, or argument raised in the arbitration was unreasonable, the arbitrator may assess all or part of the expenses of the other party (including reasonable attorneys' fees) and of the arbitrator as the arbitrator deems appropriate.  The arbitrator may not award either party punitive or consequential damages. Notwithstanding the foregoing, Company may seek immediate injunctive relief from a court of competent jurisdiction without

**EXECUTIVE EMPLOYMENT AGREEMENT**

necessity of posting bond to forestall Executive's actual or threatened breach of paragraph a hereof. Executive hereby consents to the exclusive jurisdiction of, and waive any objection to venue in, such courts.

g.  NO CONFLICT. BY EXECUTING THIS AGREEMENT, EXECUTIVE HEREBY REPRESENTS AND WARRANTS TO COMPANY THAT EXECUTIVE IS NOT PRECLUDED BY ANY AGREEMENT (WHETHER WRITTEN OR ORAL), OR ANY FIDUCIARY OR CONTRACTUAL RESTRICTIONS WHATSOEVER FROM ACCEPTING THIS OFFER AND FULFILLING THE RESPONSIBILITIES REQUIRED UNDER THE TERMS OF THIS AGREEMENT. EXECUTIVE FURTHER UNDERSTANDS THAT EXECUTIVE'S SIGNATURE BELOW CONSTITUTES EXECUTIVE'S AFFIRMATIVE REPRESENTATION, WHICH EXECUTIVE UNDERSTANDS WILL BE RELIED UPON BY COMPANY, THAT THERE ARE NO SUCH RESTRICTIONS.

**for Company:**                              **for Executive:**

_____GAETANO P.LATORRE_____      _____DAVID FLORES_____
printed name                                printed name

                                            *David Flores*
_____      _____

Date: _____            Date: 1/29/20_____

**EXECUTIVE EMPLOYMENT AGREEMENT**

# EXHIBIT A

## PRIMARY RESPONSIBILITIES

Executive shall have the following responsibilities:

1. Drive the post-sale journey of our key accounts, from initial onboarding to product adoption, expansion, advocacy, and ultimately renewal.
2. Serve as the primary contact with new customers post-sale and work with the onboarding team to ensure a smooth onboarding and training process
3. Build relationships and trust with new customers with the goal of being seen as a partner not just a vendor
4. Establish and manage financial and clinical performance metrics to share with the customer in facility reports on a regular basis
5. Determine users' level of engagement with the platform to identify problems and provide feedback to the other teams regarding product and service issues and improvements
6. Collaborate with the engineering and development team to troubleshoot technical issues raised by customers
7. Represent the voice of the customer to provide input into every core product, marketing and sales process
8. Collaborate closely with team members to support renewals and expansion opportunities
9. Invoice and bill client appropriately
10. Other duties as assigned.

**EXECUTIVE EMPLOYMENT AGREEMENT**

# EXHIBIT B

## EQUITY GRANT PROVISIONS

On July 12th, 2018 the Executive had previously been awarded a grant of 350,000 options to acquire Company common shares exercisable at $0.01 per share and vesting under the terms of the Company's "2017 Stock Option and Incentive Plan" which was approved by the Company's Board of Directors

On July 12th, 2018 the Executive had previously been awarded a grant of 150,000 options to acquire Company common shares exercisable at $0.01 per share and vesting under the terms of the Company's "2017 Stock Option and Incentive Plan" which was approved by the Company's Board of Directors

On October 10th, 2019 the Executive, who was then serving as our Chief Operating Officer, was awarded an additional 500,000 options to acquire Company common shares exercisable at $0.01 per share and which was approved by the Company's Board of Directors on October 10th, 2019. The Board agreed that these additional options will be awarded on the following milestone schedule and vest under the terms of our "2017 Stock Option and Incentive Plan":

| # Options to Vest | Associated Milestones |
|---|---|
| 1/3 | Safe-note raise of $250,000 or more |
| 1/3 | Equity raise of $1,000,000 or more |
| 1/3 | Company Revenues of $1,000,000 |

**Exercise Period.** The period for the exercise of each Option granted hereunder shall be determined by the Committee, but the Stock Option Agreement with respect to each Option shall provide that such Option shall not be exercisable after the expiration of seven years from the date of grant of the Option. The Committee shall require each Option granted hereunder to vest over a period of at least eighteen (18) months, with either (i) the equal release of the shares on a quarterly basis, or (ii) the release of a majority of the shares later in the vesting period

**Acceleration of Vesting Upon Termination.** Notwithstanding any other term or provision of this Agreement, in the event that the Executive's Continuous Service is terminated by the Company without Cause, the portion of the options granted, that have vested under the terms of the Company's 2017 Stock Option Plan, shall become vested as of the vesting date specified in the Executive's Stock Option Agreement with the Company.

**Change in Control Vesting.** Upon a Change in Control, and notwithstanding any provision to the contrary in any applicable plan, program or agreement, upon the occurrence of a Change in Control, all equity incentive awards held by the Executive shall become fully vested and all stock options held by the Executive shall become fully exercisable.

**EXECUTIVE EMPLOYMENT AGREEMENT**

# EXHIBIT "C"

 **Smart**Steward

From:   Antibiotic Adjuvant, Inc.
        747 SW 2nd Ave # 43
        Gainesville FL, 32601

To:     Mr. David Flores
        3631 NW 67th Ave
        Gainesville FL, 32653

Dear Mr. Flores,

This letter is to inform you that your employment with Antibiotic Adjuvant, Inc. will end as of today, May 18th, 2020.

You have been terminated without cause as per section 5(d) of your employment agreement dated January 29th, 2020.

This decision is not reversible.



You are requested to return all company documents in your control as well as any company credit cards and other company property you may still have.

Also, please keep in mind that you have agreed to non-disclosure, non-solicitation, non-competition and non-disparagement clauses as part of your employment agreement.

If you have questions about your termination feel free to contact me.

Sincerely,

Guy LaTorre
CEO
Antibiotic Adjuvant, Inc.
cc: Jeff Goodman

SmartSteward Inc.,47 SW 2nd Ave # 43, Gainesville, FL 32601

Confidential